**Harry E. EAKIN, Appellant
(Defendant Below),**

v.

**INDIANA INTERGOVERNMENTAL RISK MANAGEMENT AUTHORITY, Homer J. Flower, Garry McBride and Cy Gerde, Appellee (Plaintiff Below).**

No. 44A04–8811–CV–369.

Indiana Court of Appeals,
Fourth District.

Aug. 9, 1990.

Linley E. Pearson, Atty. Gen., Samuel L. Bolinger, Deputy Atty. Gen., Indianapolis, for appellant.

Bill D. Eberhard, Jr., Eberhard and Cain, P.C., LaGrange, for appellee.

MILLER, Presiding Judge.

Plaintiff-appellant Harry E. Eakin, as Insurance Commissioner of the Department of Insurance of the State of Indiana, (Commissioner) appeals the LaGrange Circuit Court's judgment finding the Indiana Intergovernmental Risk Management Authority (IIRMA) and the townships associated with it, are not engaged in the unauthorized business of insurance. On November 12, 1987, Commissioner filed a complaint for injunctive relief against defendant-appellees IIRMA, Homer J. Flower, Garry McBride and Cy Gerde, alleging they were engaged in the unauthorized business of insurance by soliciting applicants, namely political subdivisions, for participation in a program entitled "Indiana Intergovernmental Risk Management Authority" without a certificate of authority to sell insurance as required by IND.CODE § 27-1-3-20.[1] IIRMA admitted it was operating without a certificate of authority, but contended that none was required as the program it administered was not insurance, but a system of "self-insurance" permitted under the Interlocal Cooperation Act, IND.CODE § 36-1-7-1 *et seq.* The trial court signed a temporary restraining order on November 12, 1987, enjoining IIRMA from administering its program and scheduled a preliminary injunction hearing for November 19, 1987. After several continuances, a hearing was held on March 2, 1988. Evidence was presented by the parties, except for an evidentiary deposition to be taken of IIRMA's witness, Joseph L. Petrelli, which was later filed for the court's consideration. Pursuant to Ind. Trial Rule 65(2) the court determined that the evidence received should be consolidated on the merits.[2] In accordance with this rule, the trial court consolidated the issues after all evidence

was admitted.[3] On March 24, 1988, the parties submitted post-hearing briefs and requested a second hearing. The trial court granted this request and another hearing was held on April 20, 1988. On August 1, 1988 the trial court issued its final ruling finding IIRMA was not engaged in the unauthorized business of insurance. The trial court found that (1) the "Master Contract" prepared by IIRMA was not an insurance contract, and (2) Indiana law authorizes townships to enter into risk sharing agreements. The Commissioner appeals this judgment[4] claiming:

(1) the trial court erred in determining the "Master Contract" prepared by IIRMA was not an insurance contract; and

(2) the trial court erred in holding the Interlocal Cooperation Act, I.C. § 36-1-7-1 authorizes townships to enter into risk sharing agreements.

## FACTS

IIRMA is a voluntary association of six Indiana townships and one town. These townships entered into an agreement entitled "Master Contract" "for the purpose of joining and establishing a local government shared risk group" known as IIRMA. (R. 490). According to the contract, IIRMA was created under the authority of I.C. § 36-1-7-1 *et seq.* The contract specifically provides "the powers and duties created hereunder and the activities of this authority shall not constitute doing an insurance business". (R. 490). Under the Master Contract, members make two annual contributions to IIRMA. One contribution is to a "Budgetary Fund" "in amounts the Board deems sufficient to annually produce a sum of money reasonably necessary to

1. I.C. § 27-1-3-20 provides in part:
   ... No company shall transact any business of insurance in this state until it shall have received a certificate of authority as herein prescribed....

2. Ind.Trial Rule 65(A)(2) provides in part:
   (2) *Consolidation of Hearing with Trial on Merits.* Before or after the commencement of the hearing of an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced

and consolidated with the hearing of the application.

3. We note after the March 2, 1988 hearing, the trial court dismissed Cy Gerde from the lawsuit without prejudice.

4. On August 11, 1988 the trial court granted Commissioner's Motion for a Stay of the Judgment pending the resolution of the motion to correct errors and the resolution of any subsequent appeal.

fund the Authority's general and administrative expenses, reinsurance expenses of the Authority, and to pay current year claims and claims expenses and to fund any deficiencies which may occur in the Authority's Cumulative Reserve Fund." (R. 391). The second contribution is to a "Cumulative Reserve Fund". In the event of a loss, money is paid out of the Budgetary Fund first, then from the Cumulative Reserve Fund. According to one of IIRMA's brochures each member's contribution is established as follows:

> Underwriters evaluate each Public Entity individually. The underwriter determines the contribution for each member by evaluation of risk exposures. Such factors as values, construction, activities and services provided, claims history and the member's participation in loss control activities are used in this determination.

(R. 367).

The Master Contract provides that members may contract for these limits of liability, which are then set forth in the Member's Risk Sharing Certificate.

### Article XVIII—*Scope of Coverage*

*Limit of Liability*

(a) General Liability Coverage—$1,000,000 each occurrence.

(b) Automobile Liability Coverage—$1,000,000 each accident.

(c) Automobile Physical Damage Coverage—agreed valuation as needed.

(d) Public Officials Liability Coverage—$1,000,000 each claim and in the aggregate.

(e) Property, Inland Marine and Fidelity Coverage—agreed valuation as needed.

> (1) Sublimit of $1,000,000 for flood and earthquake with a $50,000 deductible.

(R. 399).

Garry McBride, who is familiar with IIRMA,[5] testified that IIRMA is a member of American Public Entity Excess Pool (APEEP). A joinder agreement between IIRMA and APEEP, which was admitted into evidence, provides:

> The undersigned executes this Contract for purposes of contractually joining together with other public entity risk sharing pools to create a contractual mechanism for reinsuring loss and spreading risk among the Contracting Members.

(R. 500).

McBride testified that APEEP administers IIRMA and "at least a half dozen other pooling entities across the United States". (R. 592). McBride explained that APEEP purchases reinsurance to provide "additional safety for the pooling entity". (R. 592). In describing how IIRMA operates, McBride explained that IIRMA has a retention level of $250,000. If a member has a claim in excess of $250,000, IIRMA pays the first $250,000 and APEEP pays the excess. (R. 591).

### ISSUE I

■ The thrust of the Commissioner's argument on appeal is that the "Master Contract" is an insurance contract and, therefore, IIRMA is engaged in the unauthorized business of insurance. IIRMA contends the master contract is not an insurance contract, but a financing agreement which allows governmental entities to self-insure.

■ As noted in *United States v. Newton Livestock Auction Market, Inc.*, 336 F.2d 673 (8th Cir.1964), "insurance and self-insurance are not equivalents. Insurance exists when a contractual relationship between the insurer and the insured shifts to the insurer the risk of loss of the insured. Self-insurance is the assumption of risk of his own loss by one having an insurable interest". *Id.* at 676. IND.CODE § 27–1–2–3(a) defines insurance as follows:

> "Insurance" means a contract of insurance or an agreement by which one party, for a consideration, promises to pay money or its equivalent or to do an act valuable to the insured upon the destruction, loss or injury of something in which

---

**5.** Garry McBride is employed by Burnham & Flower Company. Burnham & Flower is IIRMA's marketing representative.

the other party has a pecuniary interest, or in consideration of a price paid, adequate to the risk, becomes security to the other against loss by certain specified risks; to grant indemnity or security against loss for a consideration.

In a general sense, insurance is a contract whereby one party, for an agreed premium, undertakes to indemnify another party for losses arising from the happening of a particular event or contingency. *See Meyer v. Building & Realty Service Co., Inc.* (1935), 209 Ind. 125, 196 N.E. 250; *Couch on Insurance*, 2d Ed. 1:2, pp. 4–6.

■ On the other hand, "self-insurance" is not insurance at all. As stated in *American Nurses Ass'n v. Passaic General Hosp.* (1984), 196 N.J.Super. 486, 471 A.2d 66, 69:

It is the antithesis of insurance. The essence of an insurance contract is the shifting of the risk of loss from the insured to the insurer. The essence of self-insurance, a term of colloquial currency rather than of precise legal meaning, is the retention of the risk of loss by the one upon whom it is directly imposed by law or contract.

Thomas W. Rynard, in his article *The Local Government as Insured or Insurer: Some Risk Management Alternatives*, published in 20 *The Urban Lawyer*, 103, (1988) describes self-insurance as:

'[a] planned program of paying from a company's own funds for losses sustained, where it recognizes reasonably the potential losses that might be incurred, does all that it can to avoid or reduce this potential, and then provides a means to process and pay for the losses remaining. What distinguishes self-insurance from other forms of insurance is that the risk of loss is assumed by the self-insured entity; it is not shared among a group of entities.' Self-insurance is also distinguishable from going bare, i.e., not providing any means for paying incurred losses, in that a planned program is involved. A true self-insurance plan contemplates the establishment of a fund based on projections of future losses and the identification and measurement of possible and actual claims against the self-insured entity so that money from the fund may be set aside to pay those claims if and when they come due.

In analyzing whether the "Master Contract" was an insurance contract, the Commissioner relied, in part, on this test set forth in *Williston on Contracts* § 900, 3rd Edition (1979):

A true standard or old line contract of insurance must exhibit five characteristics:

1. The insureds must have an insurable interest—an interest in the insured property or insured life—capable of being valued in money;

2. The insured must be (or both parties must reasonably believe him or be) subject to a possibility of loss through damage to or destruction of his insurable interest by the happening of the casualty or death insured against;

3. The insurer must legally assume such risk of loss in a fixed or determinable amount;

4. As consideration for its assumption of risk the insurer must collect all in advance or at periodic intervals in installments from the insured and all others of his class, a ratable contribution known as a premium;

5. Losses must be distributed by the insurer among a large group of similar insureds by charges to the insurance fund built up through the systematic collection of premiums paid by all members of the insured class or group.

Applying this analysis, the Commissioner claims the "Master Contract" is clearly an insurance contract. First, the Commissioner argues the townships have an insurance interest capable of being valued in money. *See* Master Contract, Article XIX—*Property Coverage* (R. 401). Second, the townships are subject to a possibility of loss through damage to or destruction of their insurable interest. Third, IIRMA, pursuant to the Master Contract, assumes such risk of loss in a fixed or determinable

amount.[6] Fourth, in consideration for its assumption of risk, IIRMA collects annual contributions from the townships, and finally, commissioner argues, losses are distributed by IIRMA among a large group of similar entities. The commissioner notes IIRMA's solicitation brochure states:

### IS THERE PROTECTION BEYOND THE FUNDS OF THE AUTHORITY?

Yes. Indiana Intergovernmental Risk Management Authority (IIRMA) is a member of American Public Entity Excess Pool. This allows IIRMA to *spread their losses with other public entity pools through the country.* (emphasis added).

(R. 367).

Additionally, as noted in the facts, the agreement between APEEP and IIRMA provides:

The undersigned executes this Contract for purposes of contractually joining together with other public entity risk sharing pools to create a contractual mechanism for reinsuring loss and *spreading risk among the Contracting Members.* (emphasis added).

(R. 500).

Since the Master Contract satisfies the five part test, the commissioner argues it is an insurance contract.

In contrast, IIRMA claims the Master Contract is not an insurance contract. Specifically, IIRMA disagrees with the Commissioner's argument that it assumes the risk of loss. IIRMA claims that under the contract, the individual members retain the risk of loss. In support of this position, IIRMA relies on this testimony from its hired consultant, Joseph Petrelli:[7]

The IIRMA program, the public entity in the program, is ultimately responsible for paying its own losses. It is self-insured. It pays its own losses.

\* \* \* \* \* \*

Which is why we distinguish it from traditional insurance where a certain premium transfers the risk to the insurer. The risk in IIRMA stays with the self-insured member. The losses stay with the self-insured member.

(R. 245, 251, 252).

Petrelli described IIRMA as an "alternative financing mechanism" which allows members to borrow money from the pool to pay their own losses. (R. 239). The members are then required to pay back the money over a period of time. Petrelli explained that IIRMA operates in the same way as a line of credit or a MasterCard. He stated:

Q. So the alternative financing system of pools assists that entity in paying its own claims of its own risk that isn't transferred to the pool?

[Petrelli]

A. Correct. The pool, again, outside the traditional insurance pools, the alternative financing mechanism, the pools operate—really, each member of the pool is responsible ultimately for its own losses. The pool mechanism operates sort of as a line of credit or kind of a MasterCard situation where the pool effectively loans the money to the public entity or the pool member.

(R. 240–241).

However, Petrelli's testimony is not supported by the language of the Master Contract or by the language of IIRMA's solicitation brochure. The contract provides:

In the event that a claim or a series of claims exceed the amount of protection provided by the Member's Risk Sharing Certificate, or in the event that a series of losses should exhaust the Budgetary Fund, the Cumulative Reserve Fund and any reinsurance, then payment of valid criteria and procedures to be established for the payment of claims as provided in the Member's Risk Sharing Certificate.

(R. 393).

---

**6.** Under the contract, the townships contract for various limits of liability which are set forth in the Member's Risk Sharing Certificate. The Master Contract provides:

The Authority provides risk sharing protection to each Member and will make or secure payment on behalf of each Member under

**7.** Petrelli is a property and casualty insurance agent licensed in the State of Ohio.

claims shall be the sole and separate obligation of the individual Member or Members against whom the claim was made and perfected by litigation or settlement.

(R. 393).

This language indicates that IIRMA assumes the risk of loss to the extent that the member's loss does not exceed the amount of protection provided by the risk sharing certificate. If the member's loss exceeds the amount contracted for, the individual member is responsible for the excess. This result would be the same if the individual member had purchased insurance and a claim exceeded the policy limits. In that scenario, the insured would be responsible for any amount over and above the policy limit.

IIRMA contends that, under the contract, a member must repay any loss which exceeds that member's prepaid contributions. However, there is no provision in the agreement providing that the members repay IIRMA any amount over and above the annual contributions. In fact, the agreement specifically provides:

> The liability of each member is *limited* to the amount of financial contributions required to be made to the shared risk group pursuant to this Agreement. (emphasis added).

(R. 384).

Additionally, IIRMA's solicitation brochure provides:

> FACT: The amount above is IIRMA's responsibility. The individual member is only responsible for their deductible level, normally $250 on Property and Automobile claims and zero deductible on General Liability claims.

(R. 371).

This advertisement indicates that members are only responsible for the deductible level and IIRMA is responsible for the rest of the claim, and not limited to the amount of contribution made to IIRMA by the member. The language from the contract and from the brochure is corroborated by the testimony of Garry McBride.

McBride testified that if a member sustains a loss, that member pays a deductible amount—set forth in the Member's Risk Sharing Certificate—and the rest of the claim is paid by IIRMA from the Budgetary Fund and if necessary, from the Cumulative Reserve Fund. McBride testified that IIRMA has a retention level of $250,-000. To the extent that a member's loss exceeds $250,000, APEEP pays the excess. McBride testified the monies in the Budgetary Fund and the Cumulative Reserve Fund are replenished the next year when the members make their annual contributions. (R. 590–593, 613–616). McBride's testimony is supported by this language in the contract:

> In the event that there exists at any time a deficiency in the Property Budgetary Fund such deficiency shall be cured by a withdrawal from the Property Cumulative Reserve Fund. In the event that the Property Cumulative Reserve Fund is exhausted, the Administrator shall immediately collect any reinsurance as may be available to the Authority. In the event that the Authority and any available reinsurance funds shall be exhausted any remaining deficiency shall then be added to the next year's Annual Property Budget and *the deficiency shall be cured upon receipt of Members Annual Property Budgetary Contribution.* (emphasis added).

(R. 402–403).

McBride's testimony, the language of the contract and the language of IIRMA's brochures indicate that IIRMA assumes some risk of loss and that losses are distributed among the individual members of IIRMA and other public entity risk sharing pools—pursuant to the joinder agreement with APEEP. Thus, the evidence supports the conclusion that the Master Contract is actually an insurance contract.

In determining the Master Contract was not an insurance contract and, therefore, not subject to regulation by the Commissioner, the trial court relied on case law from other jurisdictions. Specifically, the trial court relied on *Antiporek v. Village of Hillside* (1986), 114 Ill.2d 246, 102 Ill.

Dec. 294, 499 N.E.2d 1307 and *Ponder v. Fulton–DeKalb Hosp. Authority* (1987), 256 Ga. 833, 353 S.E.2d 515.

In *Antiporek*, a plaintiff filed a negligence action against a municipality claiming the municipality's participation in the Intergovernmental Risk Management Agency (IRMA) resulted in a waiver of its tort immunity. In Illinois, local public entities are granted certain immunities from tort liability by statute. However, such immunities are waived if the public entity is protected by a policy of insurance. The trial court was persuaded by the plaintiff's argument that IRMA was an insurance company within the meaning of the statute and entered judgment for the plaintiff. The municipality appealed and the appellate court reversed, finding IRMA was not an insurance company within the meaning of the statute. The Illinois Supreme Court affirmed the appellate court's decision, finding IRMA was a system of self-insurance, not insurance. Therefore, participants in IRMA did not waive their immunity from tort liability. In reaching this decision the court reasoned:

> IRMA provides a totally different type of protection—one tantamount to self-insurance within the meaning of section 9–103. Participating public entities, too small to self-insure, pool their resources and risks to provide a level of protection from potential fiscal disasters which would otherwise accompany large, non-immune liabilities. IRMA participants have not shifted the risk to for-profit risk takers, but have instead decided to share the risk among themselves. The contract and bylaws are distinguishable from commercial policies in that they require supplemental contributions from all members—even those which have submitted no claims—if liabilities outstrip annual contributions. A complementary provision reduces each participant's next succeeding annual contribution if claims against the pool are fewer than forecast. Funding IRMA in that manner underscores that the risks and costs of civil liability are completely internalized among its participants, so every penny paid on every claim is taken from reve-

nue otherwise available to meet the governmental responsibilities of member municipalities. Finally, because there are no private investors or nongovernmental participants, there is no danger that private persons will receive an unconscionable profit by accepting premiums while asserting immunities to avoid claims.

*Id.*, 102 Ill.Dec. at 296, 499 N.E.2d at 1309.

As the *Antiporek* court noted, the risks and costs of civil liability are *completely internalized* among the participants of IRMA. The contract requires supplemental contributions from all members if liabilities outstrip annual contributions. In the case before us, the risk and costs of civil liability are *not* completely internalized. The participants in IIRMA make annual contributions and may contract for up to $1,000,000 of liability coverage. To the extent that a member's loss exceeds that member's annual contribution, additional funds are provided by IIRMA—up to $250,-000—and by APEEP—presumably up to $1,000,000. Thus, IIRMA is more analogous to an insurance company than to a system of self-insurance because the participants pay an annual contribution in consideration for indemnification from IIRMA on the occurrence of enumerated perils.

Additionally, in *Antiporek*, the court noted IRMA participants agreed to share the risk of loss among themselves, rather than involving private investors or nongovernment participants. In the case before us, there are some nongovernmental participants. This does not appear to be a case where governmental units have joined together and drafted an agreement among themselves. Here, the contract was drafted by American Risk Pooling Consultants, Inc. Additionally, townships are solicited for membership by Burnham & Flower Agency of Indiana, Inc. Apparently, Burnham & Flower receive a commission when a governmental entity joins IIRMA. The minutes from a board meeting held on October 13, 1987, which were admitted into evidence, reveal that Burnham & Flower received a commission check for $5,054.61. (R. 536). Because the program administered by IIRMA involves more than an

**1102**

agreement between townships to share the risk of loss among themselves, we find the risk management pool outlined in *Antiporek* to be significantly distinguishable from the program in the case before us.

■ In reaching its decision that governmental entities may self-insure and that such activity does not constitute insurance, the trial court also relied on *Ponder, supra*. In *Ponder*, a patient brought a medical malpractice action against a hospital, which was primarily maintained as a charitable institution. The hospital moved for summary judgment, asserting it was immune from liability under the charitable immunity doctrine. The trial court granted partial summary judgment finding the charitable immunity doctrine barred the patient's claim against the hospital *except* to the extent that funds were available under the hospital's self-insurance plan. The patient and the hospital appealed this ruling. On appeal, the Georgia Supreme Court found the hospital did not waive its immunity because the hospital's self-insurance plan did not exhibit enough of the characteristics of ordinary insurance.[8] In reaching this conclusion, the court reasoned:

> The definition of insurance demonstrates the respects in which [the Hospital's] plan differs from ordinary insurance. Insurance is a contract whereby one party agrees to assume certain risks for another party in consideration for the payment of premiums and to pay the insured party a specified amount on the happening of a particular contingency. (citations omitted) A necessary element of insurance is distribution of risk. Under [Hospital's] plan, no premium is paid, no second party assumes the risk and no distribution of risk is accomplished. The [Hospital's] plan better fits into the mold of a reserve fund created to protect against contingencies.

*Id.*, 353 S.E.2d at 517.

However, unlike *Ponder*, IIRMA's "self-insurance plan" does exhibit characteristics of ordinary insurance. Under the contract, the townships pay annual "premiums", a second party (IIRMA) assumes some risk of loss and there is a distribution of risk among similar entities. Thus, the evidence reveals that IIRMA's program is actually offering insurance rather than providing for self-insurance. For the foregoing reasons, we find the trial court erred in denying the Commissioner injunctive relief. We reverse and remand this cause to the trial court to enter judgment in accordance with this court's opinion. Due to our resolution of Issue I, we need not discuss whether I.C. § 36–1–7–1 *et seq.* would allow local governments to enter into risk sharing agreements.

The decision of the trial court is reversed.

CHEZEM, J., concurs.

CONOVER, J., dissents with opinion.

CONOVER, Judge, dissenting.

I respectfully dissent. Although the master contract defining the pooling agreement between the townships does have some indicia of a standard insurance contract, its overall effect and purpose is self-insurance.

In my opinion, the majority's concept of self-insurance is too narrow. In *Antiporek, supra*, the Illinois Supreme Court recognized IRMA was a self-insurance plan. In so doing, it noted we must be careful to look at the substance of innovative methods designed for efficient and realistic risk management.[1] 102 Ill.Dec. at 296, 499 N.E.2d at 1309. The plan in the instant case is identical to the *Antiporek* plan: small governmental operations have combined their resources to be able to pay future claims against them. The master contract in this case provides each governmental entity must make annual contributions to the Budgetary and Cumulative Reserve Funds. These funds, like the pooled

---

8. A charitable institution waives its charitable immunity to the extent of any liability insurance which it carries. *Id.*, 353 S.E.2d at 516.

1. We need not speculate on the need for innovation in this age of increasing insurance premiums. The question here is whether Indiana townships are authorized to enter into self-insurance contracts.

funds in *Antiporek,* provide the primary sources for the payment of claims. The fact the pooling agreement here also provides a portion of the contributions to the Budgetary Fund be used to purchase third tier reinsurance does not, in my opinion, make the agreement an insurance contract governed by IND.CODE 27–1–3–20. Reinsurance is an innovative and efficient enhancement of, and supplement to, the self-insurance plan.

Furthermore, it is my opinion IIRMA is authorized by the Interlocal Cooperation Act. Indiana law provides "[a] political subdivision *may* purchase insurance to cover the liabilities of itself or its employees." (Emphasis supplied). IC 34–4–16.5–18.[2] The legislature's use of the term "may" is permissive. *City of Tell City v. Noble* (1986), Ind.App., 489 N.E.2d 958, 961, *reh. denied, trans. denied.* Thus, the political

subdivision (township) has the discretion to decide whether the purchase of insurance is the best way to protect against liability. The corollary to that language is a township not choosing to purchase insurance may protect itself with a plan of self-insurance or "run naked," i.e., have no insuring plan at all. Under the Interlocal Cooperation Act, a power that can be exercised by a single political subdivision can be exercised jointly with other entities. IC 36–1–7–2.

I would affirm the judgment of the trial court.

---

2. A township is a "political subdivision" under IC 36–1–2–13.